ALABAMA STATE TEACHERS ASSO-CIATION, a corporation; Alvin A. Holmes; William Sankey; Albert Harris; Sylvester Pressley; and Joe L. Reed, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

ALABAMA PUBLIC SCHOOL AND COL-LEGE AUTHORITY, a corporation et al., Defendants.

Civ. A. No. 2649–N.

United States District Court
M. D. Alabama, N. D.

July 26, 1968.

Fred D. Gray, of Gray, Seay, Langford & Pryor, Montgomery Ala., and Morris S. Dees, Montgomery, Ala., for plaintiffs.

MacDonald Gallion, Atty. Gen., Gordon Madison, Asst. Atty. Gen., State of Alabama, Montgomery, Ala., for Alabama Public School and College Authority and its officers.

James J. Carter, of Hill, Hill, Stovall & Carter, Montgomery, Ala., and Thomas D. Samford, III, Samford & Samford, Opelika, Ala., for Members of Board of Trustees of Auburn University, and Board of Trustees of Auburn University.

Before GEWIN, Circuit Judge, and JOHNSON and PITTMAN, District Judges.

FRANK M. JOHNSON, Jr., District Judge:

The plaintiffs in this class action seek to prevent the State of Alabama from constructing and operating a four-year, degree-granting extension of Auburn University in the City of Montgomery, Alabama. Plaintiffs originally sought a declaratory judgment as to the invalidity of and an injunction against any action under or pursuant to Alabama Act No. 243 of 1965 and Alabama Act No. 403 of 1967.[1]

---

1. Alabama Act No. 243 of 1965 authorizes the formation of the Alabama Public School and College Authority, a public corporation, having the power, among other things, "to provide for the construction, reconstruction, alteration and improvement of public buildings and other facilities for public educational purposes in the State, including the procurement of sites and equipment therefor; to anticipate by the issuance of its bonds the receipt of the revenues" from those portions of the state sales tax and state use tax that are required to be paid into the Alabama Special Educational Trust Fund by issuing bonds solely out of and secured by a pledge of the said portions of those excise taxes. The Act authorizes the Authority to issue and sell bonds not exceeding $116,000,000 in aggregate principal amount and provides for the allocation of proceeds from the sale of the bonds, in the amounts specified therein, to educational institutions (including Auburn University) named in Section 10 of the Act. Section 10 identifies some of these institutions as "Negro."

Alabama Act No. 403 of 1967 authorizes the Alabama Public School and College Authority to issue and sell bonds in the principal amount of $5,000,000 in addition to all other bonds theretofore issued or authorized to be issued by the Authority, the net proceeds of which "shall be distributed to Auburn University to be used by the board of trustees thereof for construction and equipment of physical facilities for conducting a four-year college or branch of the University in the City of Montgomery and for the support and maintenance of such college for each of the fiscal years ending September 30, 1968 and September 30, 1969."

While originally alleging that both acts were unconstitutional as being racially discriminatory and that Act No. 243 was unconstitutional "on its face and as applied," plaintiffs at the beginning of the hearing on the merits of this case announced an abandonment of their challenge to Act No. 243:

"Mr. Gray: If it please the Court, the plaintiffs do not insist and do not urge upon the Court at this time to declare unconstitutional Act Number 243, which was adopted on May 4, 1965, creating the Alabama Public School and College Authorities. * * *"

Jurisdiction is invoked pursuant to 28 U.S.C. § 1343 and 28 U.S.C. § 1331. Plaintiffs seek a declaratory judgment that Act No. 403 of 1967 is unconstitutional and also seek an injunction against the enforcement, operation and execution of the said act. A three-judge court was convened to hear this cause pursuant to 28 U.S.C. §§ 2281, 2284.

The defendant Alabama Public School and College Authority is a corporation formed by the defendants the Governor, the State Superintendent of Education, and the Director of Finance pursuant to Alabama Act of 1965 No. 243. Defendant is authorized, *inter alia*, "from time to time to sell and issue its bonds, not exceeding One hundred sixteen million dollars ($116,000,000) in aggregate principal amount, for the purpose of providing funds for construction, reconstruction, alteration, and improvement of buildings and other facilities for public educational purposes in the State * * *." Alabama Acts 1965, No. 243, § 8. Section 10 of the Act sets out detailed appropriations of the authorized monies to the various public colleges. Alabama Acts 1967 No. 403 authorizes the defendant Authority to issue and sell additional bonds in the principal amount of $5,000,000 for the purpose of constructing, equipping, establishing, creating, supporting and maintaining a four-year college at Montgomery under the supervision and control of defendant Board of Trustees of Auburn University.

Plaintiff Alabama State Teachers Association is a nonprofit corporation whose membership consists of approximately 10,000 Negro teachers, a majority of whom are graduates of Alabama State College, located in Montgomery, Alabama, and many of whom are instructors and teachers at state-supported Negro colleges and schools in Alabama. Additional plaintiffs are Negro students and alumni of Alabama State College and the Executive Secretary of Alabama State Teachers Association.

This cause is now submitted upon the pleadings, several motions to dismiss and supporting briefs, the testimony of numerous witnesses and accompanying exhibits and post-trial memoranda.

■ The plaintiffs first contend that Act No. 243 designates certain of the schools named therein for use by members of that class or race of persons commonly referred to as Negroes. Racial classifications are always suspect and subject to the most rigid scrutiny and in most cases are irrelevant to any acceptable legislative purpose. Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed. 2d 1010 (1967); McLaughlin v. State of Florida, 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964). We do not reach the issue, however, because plaintiffs claim no injury due to and request no relief from the operation of that statute. We will, however, as plaintiffs request, consider the racial classification set forth in Act No. 243 for whatever evidentiary weight it may have on the question of the constitutionality of Act No. 403.

Plaintiffs' challenge to Act No. 403 proceeds on two grounds. First they argue that to the extent that this act authorizes the sale of bonds and the distribution of the proceeds thereof to Auburn University to be used for the "support and maintenance" of such college for each of the fiscal years ending September 30, 1968 and September 30, 1969, Act No. 403, when read in conjunction with § 11 of Act No. 243, constitutes "a pledge of revenues of future fiscal years for the purpose of obtaining funds with which to meet current operating expenses," and therefore contravenes Constitution of Alabama of 1901, Art. 11, § 213.

■ This allegation raises a question of state law, a question which by itself would not support the jurisdiction of a federal court. While pendent jurisdiction over the state law claim might be said to exist because the claim also presents a substantial federal question, Brown & Root, Inc. v. Gifford-Hill & Co., 319 F.2d 65 (5th Cir. 1963); 1 Barron and Holtzoff, Federal Practice and

Procedure § 23 (1960); this seems to be a case where that jurisdiction should be declined. Sunbeam Lighting Company v. Pacific Associated Lighting, Inc., 328 F.2d 300 (9th Cir. 1964); Strachman v. Palmer, 177 F.2d 427 (1st Cir. 1949); 5 A.L.R.3d 1040, 1058. Neither of the parties has expended energy on this issue; thus, because it has not been given a full adversary airing, this issue, with repercussions far beyond this case, is hardly ripe for determination by this Court. Plaintiffs' claim on this issue is dismissed without prejudice to their proceeding in an appropriate state court.

Plaintiffs' primary attack on Act No. 403 may be stated as a syllogism: Alabama historically has had a dual system of higher education by law; although no longer supported by law, the dual system in fact remains largely intact; this Court and the Fifth Circuit recognize in the elementary and secondary education area an affirmative duty to dismantle the dual system, Lee v. Macon County Board of Education, 267 F.Supp. 458 (M.D.Ala.1967), aff'd Wallace v. United States, 389 U.S. 215, 88 S.Ct. 415, 19 L. Ed.2d 422 (1967); United States v. Jefferson County Board of Education, 5 Cir., 372 F.2d 836 (1966), aff'd en banc 380 F.2d 385 (5th Cir. 1967), cert. denied Bd. of Ed. of City of Bessemer v. United States, 389 U.S. 840, 88 S.Ct. 840 (1967); that duty is equally applicable to higher education; that duty requires officials to utilize new construction or expansion of facilities as an opportunity to dismantle the dual system; the history and operation of Acts Nos. 243 and 403 indicate that in planning the construction of the Auburn branch at Montgomery defendants did not maximize desegregation; therefore, their action is unconstitutional and should be enjoined.

At the outset it should be noted that this argument presents a case of first impression. To our knowledge, no court in dealing with desegregation of institutions in the higher education area has gone farther than ordering nondiscriminatory admissions. That is also as far as Congress went in the 1964 Civil Rights Act.[2] The Department of Health, Education and Welfare has also largely limited its concern to admissions policies in administering Title 6 of the 1964 Civil Rights Act.[3]

We too are reluctant at this time to go much beyond preventing discriminatory admissions. Although much of plaintiffs' argument is valid, several faulty premises lead us to reject the conclusion they urge upon us. We would judicially notice that Alabama has traditionally had a dual system of higher education. Furthermore, we find as a fact that the dual system in higher education has not been fully dismantled. The law is clear also that the State is under an affirmative duty to dismantle the dual system. Indeed, in Lee v. Macon County Board of Education, supra, we required the state colleges and junior colleges to refrain from discrimination in admissions and to begin faculty desegregation. We do not agree, however, with the characterization of the college authorities' conduct, nor do we agree that the *scope* of the duty should be extended as far in higher education as it has been in the elementary and secondary public schools area.

Plaintiffs fail to take account of some significant differences between the elementary and secondary public schools and institutions of higher education and of some related differences concerning the role the courts should play in dismantling the dual systems. Public ele-

2. 42 U.S.C. § 2000c–4(a) (2). Compare subsection (2) with subsection (1), which seems to authorize a wider range of civil action by the Attorney General in the elementary and secondary school area.

3. 45 C.F.R. § 80.4(d). Compare subsection (d) with subsection (c) which for elementary and secondary schools requires a plan for desegregation. Pursuant to this, H.E.W. has compiled an elaborate set of guidelines. See 45 C.F.R. § 181 (1967).

mentary and secondary schools are traditionally free and compulsory. Prior to "freedom of choice," children were assigned to their respective schools. This could be done with equanimity because, in principle at least, one school for a given grade level is substantially similar to another in terms of goals, facilities, course offerings, teacher training and salaries, and so forth. In this context, although reluctant to intervene, when the Constitution and mandates from the higher courts demanded it, we felt that desegregation could be accomplished, and that the requirements of the law would be met, without our being involved in a wide range of purely educational policy decisions. Accordingly, we felt, in dealing with the problem of desegregating the elementary and secondary public schools, that we could and should review decisions concerning the impact of site selection for new construction or expansion without overreaching our area of competence.

■ Higher education is neither free nor compulsory. Students choose which, if any, institution they will attend. In making that choice they face the full range of diversity in goals, facilities, equipment, course offerings, teacher training and salaries, and living arrangements, perhaps only to mention a few. From where legislators sit, of course, the system must be viewed on a statewide basis. In deciding to open a new institution or build a branch or expand an existing institution, and in deciding where to locate it, the legislature must consider a very complicated pattern of demand for and availability of the above-listed variables, including, also, impact on the dual system. We conclude that in reviewing such a decision to determine whether it maximized desegregation we would necessarily be involved, consciously or by default, in a wide range of educational policy decisions in which courts should not become involved. A brief review of the background of this case will, we think, reveal the wisdom of this conclusion.

At the present time there are four institutions of higher learning in Montgomery: two private—Huntingdon College and Alabama Christian College—and two public—Alabama State College and the University of Alabama Montgomery Extension Center. The Center does not grant degrees; its offerings are similar to those of a junior college. Alabama State is a predominately Negro four-year liberal arts college with an emphasis on education of teachers.

Interest in another state-supported institution in Montgomery was initially generated in the local Chamber of Commerce. A committee was appointed to determine the need for such a school. Having determined that the need existed, they proceeded to investigate ways and means. Apparently it was assumed from the beginning that expansion of the Alabama Extension Center was the way to proceed. Thus, University of Alabama officials were approached to discuss their willingness to undertake an expansion. The University determined that it had sufficient commitments with other branch expansions. At that point, Auburn University was approached and it agreed to undertake the project. The University of Alabama agreed to cooperate in the transition from the University Center to the new operation. A Montgomery legislative delegation was then successful in securing a legislative appropriation for the project. Prior to this litigation a vice president for the Auburn branch was nominated. He submitted an academic plan that projected a long-range enrollment of 15,000 students. Current plans call for undergraduate majors in Liberal Arts, Business, and Teacher Education, as well as graduate work in appropriate areas, e. g., Education, Business Administration, and Political Science.

Plaintiffs make a number of contentions concerning this history. They maintain that the reason for having a new college in Montgomery was to provide for white students in the area. To the extent that this may mean "to provide for white students only," the record

does not bear them out. Plaintiffs rely heavily upon testimony that 137 students commuted from Montgomery County for the purpose of attending the Alexander City State Junior College located at Alexander City, Alabama, although Montgomery County is not supposed to be in that school's geographic area. However, it is noted that 12 of those 137 students are Negroes, and there is nothing in the record now before this Court to indicate that those Negroes, if they so desire, will not be absorbed into the new Auburn branch in Montgomery along with other Negroes and whites.

Plaintiffs further contend that inadequate consideration was given to how the proposed Auburn branch might be operated so as to eliminate the dual school system and that, because of this, the new college has become and will continue to be an identifiably "white" institution. This contention is based partly on the assertion that Auburn University is an identifiably "white" institution. In a sense that is so, but in that sense nearly every existing institution is "identifiable." If such identity precludes expansion, none could expand. Plaintiffs' contention that inadequate attention was given to desegregation is also based on defendants' failure to give serious consideration to expanding Alabama State College as an alternative to establishing the Auburn branch. But this argument overlooks the fact that Alabama State is at least as identifiably "black" as Auburn is identifiably "white." In terms of eliminating the dual school system, one label is no more preferable than the other.

We thus reject plaintiffs' conclusion that, when the new college is put into operation, Montgomery will have two colleges—one Negro, one white. As plaintiffs themselves indicate: "In terms of anything heretofore existing in Montgomery, the Auburn branch will be for all practical purposes a 'new institution.'" It is certainly as reasonable to conclude that a new institution will not be a white school or a Negro school, but just a school, as it is to believe that Alabama State would so evolve.

Much of the above discussion is based on speculation; this is necessarily true because much of plaintiffs' argument is based on speculation. However, the discussion does serve to show that in the discharge of the duty to maximize desegregation, the Auburn branch is at least arguably as acceptable as any alternative proffered by plaintiffs.

Defendants apparently did not seriously evaluate Alabama State College's potential as an alternative. But at the hearing evidence was introduced that tended to show that Auburn would be more suitable for the purposes envisioned because it could offer a wider range of courses, greater breadth and depth of faculty, and greater physical resources. It was also considered important by the educator witnesses that Auburn had higher admission and transfer requirements. Some evidence that the preference for Auburn's offerings over those of Alabama State was based on educational grounds is the fact that defendants rejected an offer to operate the branch from Troy State University, an institution not unlike Alabama State except that it is larger and is traditionally predominately white.

Auburn University has been ordered by this Court to admit all qualified Negroes on terms consistent with the equal protection clause of the Fourteenth Amendment. Franklin v. Parker, 223 F.Supp. 724 (M.D.Ala.1963), modified and aff'd 331 F.2d 841 (5th Cir. 1964). It would appear that Auburn has abided and will continue to abide by that order in good faith. Testimony indicated that it has recruited and is continuing to recruit more Negro faculty members.

■ We conclude, therefore, that as long as the State and a particular institution are dealing with admissions, faculty and staff in good faith the basic requirement of the affirmative duty to dismantle the dual school system on the college level, to the extent that the sys-

tem may be based upon racial considerations, is satisfied.

This is not to suggest that we view the problem as merely personal rather than systematic. As plaintiffs indicated, nondiscriminatory admissions in higher education are analogous to a freedom-of-choice plan in the elementary and secondary public schools. We are also cognizant that recent Supreme Court decisions [4] have cast doubt on the continued viability of freedom of choice in the public schools. But we do not interpret those decisions as applying to the operation of an education system on a college level. Freedom to choose where one will attend college, unlike choosing one's elementary or secondary public school, has a long tradition and helps to perform an important function, viz., fitting the right school to the right student.

We believe that an effective beginning has been made at Auburn to dismantle the racial characteristics of that school system and that, as effective desegregation plans are developed in the elementary and secondary public schools, the problem will probably resolve itself in the case of higher education. If the Auburn branch at Montgomery is administered as "just a school," as we are assured it will be and as we are confident it will be, our conclusions as herein outlined will receive significant confirmation.

Accordingly, it is the order, judgment and decree of this Court that the challenged statute, Alabama Act No. 403, 1967 Legislature, is not unconstitutional on its face or as applied to plaintiffs; it is further ordered that the relief herein sought by plaintiffs be and the same is hereby denied.

It is further ordered that the costs in this proceeding be and they are hereby taxed against the plaintiffs, for which execution may issue.

4. Green v. County School Board of New Kent County, Virginia, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (U.S. May 27, 1968), and the companion cases Monroe v. Board of Commissioners of City of

Jackson, Tenn., 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733, and Raney v. Board of Education of Gould School District, 391 U.S. 443, 88 S.Ct. 1697, 20 L. Ed.2d 727.